UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DENNIS MANSKE,                        )
                                      )
            Plaintiff,                )
                                      )
      v.                              )        2:10-cv-00320-JAW
                                      )
UPS CARTAGE SERVICES, INC.,           )
                                      )
            Defendant.                )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Concluding that the complaints of a trucking company employee to the company about the condition of its trucks may constitute protected conduct under the Surface Transportation Assistance Act, the Court denies the employer's motion for summary judgment.

I.    **STATEMENT OF FACTS**

      A.    **Procedural Background**

On July 30, 2010, Dennis Manske filed a complaint against UPS Cartage Services, Inc. (Cartage), alleging that Cartage violated the Surface Transportation Assistance Act (STAA), the Maine Human Rights Act (MHRA), and the Maine Whistleblowers' Protection Act (MWPA).[1]  *Pl.'s Compl. and Demand for Jury Trial Inj. Relief Sought* (Docket # 1).  Cartage answered on October 21, 2010.  *Ans. and Aff. Defenses of Def. UPS Cartage Servs., Inc.* (Docket # 8).  On September 21, 2011,

---

[1] Mr. Manske's Complaint also named UPS Supply Chain Solutions, Inc. as a defendant but on May 12, 2011, the parties filed a stipulation, agreeing to its dismissal.  *Stip. of Dismissal* (Docket # 33).

Cartage moved for summary judgment and filed a statement of material facts. *Def.'s Mot. for Summ. J.* (Docket # 46) (*Def.'s Mot.*); *Statement of Material Facts* (Docket # 47) (DSMF).   On October 12, 2011, Mr. Manske responded with an opposing memorandum and statement of material facts, which included responses to Cartage's statement of facts and a set of additional facts. *Pl.'s Opp'n to Def.'s Mot. for Summ. J.* (Docket # 54) (*Pl.'s Opp'n*); *Pl.'s Opposing Statement of Material Facts; Pl.'s Additional Statement of Material Facts* (Docket # 55) (PRDSMF; PSAMF).   On November 7, 2011, Cartage replied with a memorandum and responsive statement of material facts. *Def.'s Reply Mem. in Support of its Mot. for Summ. J.* (Docket # 61) (*Def.'s Reply*); *Def.'s Resp. to Pl.'s Additional Statement of Material Facts* (Docket # 62) (DRPSAMF).[2]

## B.   Statement of Facts[3]

### 1.   Cartage

Cartage is incorporated in the state of Delaware and has a principal place of business in the state of Georgia.  DSMF ¶ 1; PRDSMF ¶ 1.  Cartage is a subsidiary of United Parcel Service, Inc. (UPS), which operates a package delivery system throughout the world.  DSMF ¶ 2; PRDSMF ¶ 2.  UPS Supply Chain Solutions, Inc. (Supply Chain Solutions) is a subsidiary company of UPS that specializes in the transportation of heavy air freight for customers around the world, which is often

---

[2] Mr. Manske has filed a motion to exclude the testimony of Darry Stuart, one of Cartage's experts. The Court will separately address the motion to exclude Mr. Stuart's testimony.

[3] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Manske consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  In compliance with this obligation, the Court recites certain events as facts even though Cartage disputes them.

transported using large tractor trailer trucks and aircraft.  DSMF ¶ 3; PRDSMF ¶ 3.

Cartage is a company that picks up and delivers heavy air freight on behalf of Supply Chain Solutions.  DSMF ¶ 4; PRDSMF ¶ 4.  UPS has acquired a number of businesses over the years related to the package delivery industry and acquired a company known as Menlo Forwarding (Menlo) in December 2004, which operated from a facility located at 470 Riverside Street, Portland, Maine.  DSMF ¶ 5; PRDSMF ¶ 5.  UPS integrated the Menlo business into the business of Cartage and continued to operate from the Portland, Maine facility until Cartage closed that facility on May 13, 2011.  DSMF  ¶ 6; PRDSMF ¶ 6.

Cartage's operation in Portland involved picking up heavy air freight from commercial customers of Supply Chain Solutions in local package trucks and transporting that freight in large tractor-trailer trucks from the Portland facility to distribution points in either Manchester, New Hampshire or Poughkeepsie, New York.  DSMF ¶ 7; PRDSMF ¶ 7.  Cartage also transported freight from the distribution points in Manchester and Poughkeepsie back to Portland for local delivery to customers of Supply Chain Solutions.  DSMF ¶ 8; PRDSMF ¶ 8.  In the summer of 2008, Cartage employed approximately thirteen commercial vehicle drivers at the Portland facility.  DSMF ¶ 9; PRDSMF ¶ 9.

Unionized drivers at the Portland facility were members of the International Brotherhood of Teamsters Local 340 (Union) and operated pursuant to a collective bargaining agreement (CBA) with Cartage.  DSMF ¶ 10; PRDSMF ¶ 10.  As

provided in Article 6 of the CBA, new drivers hired by Cartage worked under the CBA but were subject to a thirty-day probationary period before they could become members of the Union, at which point the rights of the CBA would attach. DSMF ¶ 11; PRDSMF ¶ 11. Article 6 of the CBA further permitted Cartage to extend the probationary period for an additional thirty days for any reason. DSMF ¶ 12; PRDSMF ¶ 12. Although the CBA provided that Cartage could not terminate Union members without "just cause," the CBA did not restrict Cartage's ability to terminate probationary employees for any lawful reason. DSMF ¶¶ 13-14; PRDSMF ¶¶ 13-14.

Before June 2008, Cartage hired a third-party vendor to transport freight on the so-called line-haul route, which consisted of shipping freight by truck between Cartage's facility in Portland, Maine and the Boston-Manchester Regional Airport in Manchester, New Hampshire. DSMF ¶ 15; PRDSMF ¶ 15. Cartage began using its own drivers to drive the line-haul route in late June 2008. DSMF ¶ 16; PRDSMF ¶ 16.

### 2.   Management at Cartage Portland

As of August 2008, Marie "Lynn" Easler was General Manager of Cartage's Portland center and three supervisors, Jaye Smith, Jamie Lovejoy, and Darren Chipman, reported to her as General Manager. PSAMF ¶ 1; DRPSAMF ¶ 1. Ms. Easler was responsible for overseeing the profitability, the service index scores, the Human Resources part of Cartage's employee base, and the entire profit and loss statement. *Id.* Ms. Easler did not routinely receive reports of safety problems with

the trucks and did not directly address these problems; however, the supervisors reported to her on safety-related issues and, as General Manager, she had ultimate responsibility for safety.[4]   PSAMF ¶¶ 2-3; DRPSAMF ¶¶ 2-3.   During a recorded conversation on August 16, 2008 between Mr. Manske and Ms. Easler, Ms. Easler indicated to him that she was not the person at Cartage who had the power to address reports regarding equipment and how it should be "specked."  PSAMF ¶ 5; DRPSAMF ¶ 5.

Darren Chipman, as Operations Supervisor, was responsible for ensuring that drivers were properly inspecting the trucks and, as a supervisor, he was responsible for equipment, maintenance on the equipment, driver write-ups, and getting equipment repaired.[5]  PSAMF ¶¶ 6-7; DRPSAMF ¶¶ 6-7.

---

[4] In his paragraphs 2 and 3, Mr. Manske asserted that Ms. Easler was not involved in receiving reports of safety problems with trucks, addressing those problems, or overseeing the need to make sure that the trucks met safety standards.  PSAMF ¶¶ 2-3.  Cartage denied one of these assertions and interposed a qualified response to the other.  DRPSAMF ¶¶ 2-3.  The Court reviewed the portions of Ms. Easler's deposition that the parties cited.  The Court concludes that Ms. Easler testified she did not receive reports about safety problems or address those problems but that she later clarified that her supervisors reported safety-related issues to her.  The Court has incorporated both portions of her testimony in its recitation.

In his paragraph 4, Mr. Manske asserts that Ms. "Easler claims that employees never brought equipment safety issues to her attention."  PSAMF ¶ 4.  Cartage denied this assertion as not supported by the record.  DRPSAMF ¶ 4.  The Court agrees with Cartage that the record does not support Mr. Manske's assertion and has not included paragraph 4 in its recitation.

[5] In paragraphs 6 and 7, Mr. Manske referred to Mr. Chipman as the manager.  PSAMF ¶¶ 6-7.  Cartage interposed a qualified response to paragraph 6 and denied paragraph 7 on the ground that Mr. Chipman was a supervisor, not the manager and that Ms. Easler as General Manager had overall responsibility for these issues.  DRPSAMF ¶¶ 6-7.  Cartage is correct that Mr. Manske's paragraph 7 misidentifies Mr. Chipman as the manager.  The Court has properly listed his title.  Mr. Manske's description of Mr. Chipman's duties does not exclude Ms. Easler's managerial responsibilities over Mr. Chipman's areas of supervisory responsibility.

5

### 3. Driver Duties and Cartage Policies

At all relevant times, in accordance with 49 C.F.R. § 396.11, Cartage required drivers, after each trip, to inspect the condition of the vehicles they drove, including specific vehicle parts and operating systems listed in that regulation.  DSMF ¶ 19; PRDSMF ¶ 19.   At all relevant times, in accordance with 49 C.F.R. § 396.11, Cartage further required drivers to document the results of their post-trip vehicle inspections as the "reporting driver" on a form known as Equipment Daily Inspection and Condition Reports (also known as DVIRs) listing "any defect or deficiency . . . which would affect the safety or operation of the vehicle or result in a mechanical breakdown."  DSMF ¶ 20; PRDSMF ¶ 20.  To permit them to carry out these duties, Cartage provided each driver with the necessary DVIR form to be used each day for each covered truck, which form contained a list of inspection items required by 49 C.F.R. § 396.11 and provided space for driver comments.[6]  DSMF ¶ 21; PRDSMF ¶ 21.   At all relevant times, in accordance with 49 C.R.F. § 396.13, Cartage required that, before each trip, drivers inspect the vehicles they were going to drive, including specific vehicle parts and operating systems.   DSMF ¶ 23; PRDSMF ¶ 23.

---

[6] In paragraph 22, Cartage asserted that after completing a DVIR, drivers were required to submit the DVIRs to a supervisor, who would review the form and see that all deficiencies were repaired before the truck was driven again or, in some cases, that maintenance was deferred if it was safe to do so and permitted under applicable regulations.  DSMF ¶ 22.  Mr. Manske denied this paragraph, saying that repairs for things reported on the truck referred to as the "rebranded truck" around the time it arrived at the Cartage center on or about July 25, 2008 were not documented as completed until August 20, 2008.  PRDSMF ¶ 22.  Cartage's paragraph asserts a general practice and Mr. Manske responds with a specific exception.  It is unclear whether Mr. Manske's exception makes invalid Cartage's assertion of usual custom.  Nevertheless, as Mr. Manske has denied the assertion and the Court is required to view the evidence in the light most favorable to him, the Court has not included Cartage's paragraph 22.

Generally, before each trip, drivers were required to review the DVIR completed by the prior driver and sign the report as the "reviewing driver" to certify that any deficiency noted in the DVIR by the reporting driver had been repaired or deferred, that the vehicle had not been taken out of service, and that the vehicle was safe to drive; however, Cartage never instructed Mr. Manske regarding the completion of DVIRs.[7]  DSMF ¶ 23; PRDSMF ¶ 23.  It is a routine occurrence for vehicles used at Cartage, and in trucking operations generally, to require repairs for deficiencies and for drivers to report those conditions.  DSMF ¶ 24; PRDSMF ¶ 24.  At the same time, the other drivers who worked at the Cartage Portland branch did not always write up deficiencies with the trucks; during Mr. Manske's first probationary period, he was identifying issues with the trucks on his DVIRs that had not been identified by other drivers.[8]  DSMF ¶ 24; PRDSMF ¶ 24.

### 4.     Dennis Manske and his Complaints

Cartage hired Dennis Manske as a driver/dockworker on or about June 30, 2008 with the expectation that he would drive the line-haul route, although his job would become subject to the bidding procedures of the CBA if and when Mr. Manske became a member of the Union.  DSMF ¶ 17; PRDSMF ¶ 17.  Part of Mr. Manske's job duties on a typical day included driving the line-haul route on the evening shift.  DSMF ¶ 18; PRDSMF ¶ 18.

---

[7] Mr. Manske interposed a qualified response to paragraph 23.  PRDSMF ¶ 23.  The Court has included in its recitation the substance of his qualified response.

[8] Mr. Manske interposed a qualified response to paragraph 24.  PRDSMF ¶ 24.  The Court has included in its recitation the substance of his qualified response.

On various occasions during the month of July 2008, while employed at
Cartage, Mr. Manske recorded in DVIRs that several of the trucks he was required
to drive had deficiencies and submitted those DVIRs to his supervisors.    DSMF
¶ 29; PRDSMF ¶ 29.   Specifically, he reported a number of issues with a number of
the pieces of equipment that he operated during the first thirty days of his
employment with Cartage by completing and submitting pre- and post-trip DVIRs
to Cartage management.   PSAMF ¶ 8; DRPSAMF ¶ 8.   Mr. Manske also had a
number of oral discussions with his supervisors and with Ms. Easler in which he
reported deficiencies.   DSMF ¶ 30; PRDSMF ¶ 30; PSAMF ¶ 9; DRPSAMF ¶ 9.   Mr.
Manske submitted DVIRs to Cartage as either the reporting or reviewing driver
before and after each trip that he made on the line-haul route during his
employment with Cartage.   DSMF ¶ 25; PRDSMF ¶ 25.

In July 2008, Mr. Manske called Cartage supervisor Jamie Lovejoy while he
was out on the road to report that the shocks were so bad in the Cartage truck that
he was driving that it bounced down the road in a way that prevented him from
staying in his seat and resulted in his head hitting the ceiling of the cab, and Mr.
Manske told Mr. Lovejoy during this phone call that the truck should be taken out
of service when he returned to the Cartage center.[9]   PSAMF ¶ 10; DRPSAMF ¶ 10.
In early August 2008, Mr. Manske reported to Ms. Easler the issue with the truck

---

[9] Cartage denied this statement.   DRPSAMF ¶ 10.   However, the statement is clearly supported by
Mr. Manske's affidavit.   PSAMF Attach. 9, *Aff. of Dennis Manske,* ¶ 6 (*Manske Aff.*).   As the Court is
required to view the record in the light most favorable to Mr. Manske, it has included the paragraph
in its recitation.

with bad shocks and the steps he had taken to get it repaired.[10]   PSAMF ¶ 11; DRPSAMF ¶ 11.   Mr. Manske also told Mr. Chipman that the shocks were so bad on one of the trucks that when he went over a bump, he hit his head on the roof of the cab, which Mr. Chipman felt was justifiable to report.   PSAMF ¶ 12; DRPSAMF ¶ 12.   Mr. Chipman imagines he brought the issues Mr. Manske raised about the trucks to Ms. Easler's attention.   PSAMF ¶ 14; DRPSAMF ¶ 14.

On one occasion, Mr. Manske showed Ms. Easler the truck that Mr. Manske was being asked to drive for Cartage to highlight his concerns and Ms. Easler responded that the truck was "disgusting" and "should be sent to the junkyard." PSAMF ¶ 15; DRPSAMF ¶ 15.

During a meeting with Ms. Easler and supervisors Mr. Lovejoy and Mr. Chipman, Mr. Manske said that he believed that one of Cartage's trucks was set up as a city tractor and was not suitable for the line-haul route due to perceived limitations on the truck's speed and acceleration.   DSMF ¶ 31; PRDSMF ¶ 31.   Ms. Easler recalls that Mr. Manske complained to her that the truck he was assigned was a "City truck" that lacked the power and acceleration of a road truck.   PSAMF ¶ 17; DRPSAMF ¶ 17.

Mr. Manske reported to Ms. Easler that there was a wire coming out of the seat in one of the vehicles and Ms. Easler believes that the wire coming out of the seat, if not addressed, was a safety issue.   PSAMF ¶ 16; DRPSAMF ¶ 16.   Mr. Manske also asked whether Cartage would install a higher seatback in one of its

---

[10] Cartage denied this statement.   DRPSAMF ¶ 11.   However, the statement is clearly supported by Mr. Manske's affidavit.   *Manske Aff.*  ¶ 9.   As the Court is required to view the record in the light most favorable to Mr. Manske, it has included the paragraph in its recitation.

vehicles because the low seatback in the truck left nothing between his head and the glass window directly behind his head and he was worried that if he were rear-ended, his head could snap back and hit the glass, leading to serious injury.[11] DSMF ¶ 33; PRDSMF ¶ 33.

Mr. Manske reported to Cartage that a truck he was asked to drive had an exhaust leak that was resulting in fumes coming into the truck's cab.[12] PSAMF ¶ 13; DRPSAMF ¶ 13. He also reported to Ms. Easler that the engine noise for one of the Cartage trucks he was being asked to drive was too loud; Ms. Easler understood that Mr. Manske was relating this issue as a safety concern and she believed that his concerns about the truck noise were not unreasonable and were legitimate.[13] PSAMF ¶ 19; DRPSAMF ¶ 19.

---

[11] Mr. Manske interposed a qualified response to Cartage's paragraph 33. PRDSMF ¶ 33. The Court has included in its recitation the substance of his qualified response.

[12] Cartage denied this statement on the ground that the cited testimony makes clear that Mr. Manske reported an exhaust leak but not that the fumes were coming in the cab of the truck. DRPSAMF ¶ 14. The Court reviewed the cited testimony and disagrees with Cartage. Despite extremely aggressive questioning, it is clear from Mr. Manske's testimony that he was complaining that the exhaust fumes were coming in the cab. The Court has included Mr. Manske's paragraph 13.

[13] Cartage denied this statement on the ground that the citation does not support the paragraph. DRPSAMF ¶ 19. For support, Mr. Manske cited pages 40 through 44 of Ms. Easler's deposition. On page 42, the following appears:
> Q. But you do remember him at least saying something to the effect that he felt that the noise level in one truck that he was operating was too high and unsafe?
> A. I don't know if the word safety was used during that conversation.
> Q. Okay. But when you previously—your previous testimony, though, was that you felt that was an issue that he was bringing to your attention that he was trying to link to safety.
> A. Correct.
> Q. So, that's what you understood anyways, correct?
> A. Yes.
> Q. And did you feel that him even bringing that to your attention was in any way unreasonable?
> A. No.
> Q. Did you feel like he had a legitimate basis to be concerned about that?
> A. Yes.

Mr. Manske reported to Ms. Easler in early August 2008 that he had written up a Cartage truck for having a loose U-bolt and that if the police inspected the truck in question they would put it out of service.[14]  PSAMF ¶ 20; DRPSAMF ¶ 20.

Mr. Manske, along with fellow driver Alan Thomas, asked Ms. Easler and supervisor Mr. Chipman whether Cartage would add additional mirrors to the fenders of one of the Cartage vehicles.  DSMF ¶ 32; PRDSMF ¶ 32.  Mr. Manske told Ms. Easler that he felt it would be safer if the trucks had spot mirrors.[15] PSAMF ¶ 18; DRPSAMF ¶ 18.  Mr. Lovejoy was aware that Mr. Manske brought up another issue about the driver's ability to adjust the passenger side mirror and does not think that his concern was an unreasonable safety issue and would not put it into the category of "comfort issues" that Mr. Manske was mischaracterizing as safety issues.  PSAMF ¶ 21; DRPSAMF ¶ 21.

---

*Easler Dep.* 42:6-23.  Again, in view of Ms. Easler's testimony, Cartage's denial of Mr. Manske's paragraph 19 is inexplicable and frivolous.

[14] Cartage interposed a qualified response, stating that Mr. Manske had not reported the U-bolt problem to Ms. Easler in the first instance.  DRPSAMF ¶ 20.  Mr. Manske's paragraph 20 does not, however, allege that he reported the U-bolt problem to Ms. Easler in the first instance.  PSAMF ¶ 20. The Court treats the paragraph as admitted by Cartage.

[15] Cartage denied this statement.  DRPSAMF ¶18.  For support, Mr. Manske cited a portion of Ms. Easler's deposition:

> Q.  You also mentioned he brought to your attention a concern that the trucks didn't have what you refer to as spot mirrors?
> A.  Yes.
> Q.  And am I correct that you're saying that he mentioned to you that he felt it would be safer if they did have spot mirrors?
> A.  Yes.

PSAMF Attach. 4, *Videotaped Dep. of Marie Lynn Easler,* at 34:8-15 (*Easler Dep.*).  In view of Ms. Easler's testimony, Cartage's denial of Mr. Manske's paragraph 18 is inexplicable and frivolous.

Mr. Manske raised a concern to Ms. Easler that one or more of the tractors he drove on the line-haul route did not have air conditioning.[16]   DSMF ¶ 34; PRDSMF ¶ 34.   Specifically, Mr. Manske reported to Ms. Easler that the lack of air conditioning in his truck prevented him from drying out the air in the cab of his truck and as a result the windshield of his cab had fogged up while he was driving, leading him to slow down to 40 mph so that he was being passed by other tractor trailers.   PRDSMF ¶ 35.   Also, he informed her that while his windshield was fogged, he saw the taillights of a car in front of him and stepped on the brakes of his truck and ended up fish-tailing his truck.[17]   *Id.*

Mr. Chipman recalls that a so-called rebranded truck started in service on July 30, 2008 at the Portland facility.   PSAMF ¶ 22; DRPSAMF ¶ 22.   Mr. Manske inspected the rebranded truck as of the time it arrived at the Portland center after being rebranded and a few days before the truck went into service.[18]   PSAMF ¶ 23; DRPSAMF ¶ 23.   Mr. Manske completed a DVIR documenting the problems that he observed with the rebranded truck and he submitted the DVIR to Cartage.   PSAMF ¶ 24; DRPSAMF ¶ 24.   Even though Mr. Manske was not scheduled to drive the

---

[16] Mr. Manske interposed a qualified response to Cartage's paragraph 34.   PRDSMF ¶ 34.   The Court has included in the next two sentences the substance of his qualified response.

[17] Cartage asserts in paragraphs 35 and 36 that Ms. Easler told Mr. Manske that he would not be punished for reporting maintenance concerns with Cartage's vehicles and that she encouraged him to continue to document any maintenance issues that he observed.   DSMF ¶¶ 35-36.   Mr. Manske denied these assertions.   PRDSMF ¶¶ 35-36.   The Court accepts Mr. Manske's denials as it is required to view the evidence in the light most favorable to him.   Moreover, the Court agrees with him that the cited portions of the August 4, 2008 recording do not support Cartage's statements in paragraph 35 and 36.   The Court has not included either paragraph.

[18] Cartage interposed a qualified response, noting that although Mr. Manske had so testified, Mr. Lovejoy testified that Mr. Manske did not inspect the rebranded truck before writing it up.   DRPSAMF ¶ 23.   As the Court is obligated to view the evidence in the light most favorable to Mr. Manske, it has accepted Mr. Manske's testimony on this issue.

vehicle and was not by law required to complete a DVIR, he opted to inspect and write up the vehicle in advance of being scheduled to drive it so that any equipment deficiencies could be reported and addressed before the truck was put into use.[19] PSAMF ¶ 25; DRPSAMF ¶ 25.  Mr. Manske's reports brought the issues he had raised with the rebranded truck to the attention of Ms. Easler, Mr. Lovejoy, and Mr. Chipman.[20]  PSAMF ¶ 26; DRPSAMF ¶ 26.   Mr. Manske identified the following issues with the rebranded truck: the tractor protection valve was not triggering until the psi was at zero, the steering was too loose, the headlights were not properly secured, and the mirrors were painted over and rusted in place, making them difficult to adjust.[21]  PSAMF ¶ 27; DRPSAMF ¶ 27.

After Mr. Manske brought these issues with the rebranded truck to Cartage management's attention, his superiors—Ms. Easler, Mr. Lovejoy, and Mr. Chipman—called him in for a meeting.  PSAMF ¶ 28; DRPSAMF ¶ 28.  During this meeting, the managers confronted him about the DVIR that he had completed for the rebranded truck because he was not scheduled to drive the truck and so the

---

[19] Cartage moved to strike this statement on the ground that it reflects Mr. Manske's self-serving statement about his own motivation.  DRPSAMF ¶ 25.  The Court DENIES Cartage's motion to strike.

[20] Cartage interposed a qualified objection, noting that this statement does not clarify whether there were in fact issues with the rebranded truck.  DRPSAMF ¶ 26.  The Court reviewed Mr. Lovejoy's deposition transcript, which Mr. Manske cited for support of paragraph 26 and agrees with Cartage that, as presented, paragraph 26 implies that the rebranded truck in fact had problems and that the cited deposition does not support this part of the assertion.  The Court redrafted paragraph 26 to conform with the cited portion of the Lovejoy transcript.

[21] Cartage interposed a qualified response.  DRPSAMF ¶ 27.  It admits that Mr. Manske documented issues with the rebranded truck; however, it denies that he raised any specific issues with Ms. Easler.  *Id.*  As paragraph 27 does not assert that Mr. Manske raised any specific issues with Ms. Easler, the Court has ignored the qualified response.

DVIR was not a required pre-trip.[22]   PSAMF ¶ 29; DRPSAMF ¶ 29.   During this meeting, Mr. Manske reiterated his concerns about the rebranded truck in response to questions from Cartage managers.[23]   PSAMF ¶ 30; DRPSAMF ¶ 30.   Mr. Lovejoy and Ms. Easler expressed frustration with Mr. Manske's reported issues with the Cartage trucks in general and specifically with his reported list of particular concerns about the rebranded truck.[24]   PSAMF ¶ 31; DRPSAMF ¶ 31.   Mr. Manske believed that the issues he reported to Cartage management during this meeting constituted violations of the United States Department of Transportation (DOT) regulations and created safety issues for future drivers of the truck and the public.[25]   PSAMF ¶ 32; DRPSAMF ¶ 32.   During this meeting, Mr. Lovejoy was visibly upset and yelled at Mr. Manske for reporting his concerns about the rebranded truck.[26]   PSAMF ¶ 33; DRPSAMF ¶ 33.   Mr. Lovejoy admits that at the meeting, he became upset and expressed displeasure with Mr. Manske for the issues he had identified

---

[22] Cartage interposed a qualified response, admitting that Mr. Lovejoy expressed frustration and Ms. Easler reprimanded Mr. Lovejoy for his comments and told Mr. Manske that he should continue to raise issues with Cartage's vehicles.   DRPSAMF ¶ 29.   As Mr. Manske's paragraph 29 is supported by the record, the Court accepts his version.

[23] Cartage interposed a qualified response, contending that Mr. Manske's recollection is contradicted by the testimony of Ms. Easler and Mr. Lovejoy.   DRPSAMF ¶ 30.   As the Court is obligated to view the record in the light most favorable to Mr. Manske, it has included his version.

[24] Cartage denied this paragraph, saying that other evidence contradicts it.   DRPSAMF ¶ 31.   However, the paragraph is based on Mr. Manske's affidavit and, as the Court is obligated to view the record in the light most favorable to Mr. Manske, it accepts his version.

[25] Cartage moved to strike this paragraph on the ground that it is self-serving.   DRPSAMF ¶ 32.   The Court DENIES the motion to strike.   Further, Cartage denied the paragraph on the ground that it is contradicted by other evidence.   Id.   As the paragraph is supported by Mr. Manske's affidavit and the Court is obligated to view the record in the light most favorable to Mr. Manske, the Court has accepted the paragraph.

[26] Cartage interposed a qualified response on the ground that Mr. Lovejoy only "expressed frustration" and that Ms. Easler reprimanded him.   DRPSAMF ¶ 33.   As the Court is obligated to view the record in the light most favorable to Mr. Manske, it has accepted his version.

with the rebranded truck.[27]  PSAMF ¶ 34; DRPSAMF ¶ 34.  Mr. Lovejoy told Mr. Manske that he believed that Mr. Manske just wanted a Cadillac.  PSAMF ¶ 35; DRPSAMF ¶ 35.  This meeting took place a day or two before Mr. Manske's probation was extended.[28]  PSAMF ¶¶ 36, 38; DRPSAMF ¶¶ 36, 38.  Mr. Manske told Ms. Easler that he was afraid Mr. Lovejoy would retaliate against him for complaining about the issues with the trucks.  PSAMF ¶ 37; DRPSAMF ¶ 37.

Ms. Easler believes that Mr. Manske subjectively believed that the equipment issues he raised were safety concerns.  PSAMF ¶ 38; DRPSAMF ¶ 38.  Mr. Chipman believes that the issues that Mr. Manske raised about the so-called Boston and rebranded trucks were warranted.[29]  PSAMF ¶ 40; DRPSAMF ¶ 40.

Cartage's expert Darry Stuart opined that Mr. Manske appropriately reported problems with the condition of the Cartage equipment in a timely way to Cartage.  PSAMF ¶ 41; DRPSAMF ¶ 41.  Mr. Stuart believes that there was nothing inappropriate about Mr. Manske bringing these issues about the vehicles he was operating to management's attention and that Mr. Manske diligently brought to Cartage equipment issues that he deemed needed repair on the vehicle.  PSAMF ¶ 42; DRPSAMF ¶42.  Mr. Stuart concedes that some of the conditions that

---

[27] Cartage interposed a qualified response, again on the ground that Mr. Lovejoy only "expressed frustration" and that Ms. Easler reprimanded him.  DRPSAMF ¶ 34.  As the Court is obligated to view the record in the light most favorable to Mr. Manske, it has accepted his version

[28] Cartage interposed a qualified response, admitting that the meeting took place "within days" of his probation being extended but asserting that the decision to extend his probation had already been made.  DRPSAMF ¶ 36.  The Court has included Mr. Manske's version.

[29] Cartage interposed a qualified response, noting that Mr. Chipman's testimony related only to Mr. Manske's complaints about the Boston and rebranded trucks.  DRPSAMF ¶ 40.  The Court reviewed the cited portion of Mr. Chipman's testimony and agrees with Cartage.  It amended Mr. Manske's paragraph 40 accordingly.

Mr. Manske brought to Cartage's attention were "technical violations" of DOT regulations; he defined "technical violation" to mean vehicle conditions not specifically covered by DOT regulations but could nonetheless provide a basis for a driver to determine that the vehicle was unsafe to drive under his discretion.[30] PSAMF ¶ 43; DRPSAMF ¶ 43. However, Mr. Stuart agreed that a technical violation of the DOT regulations is still a violation.[31] PSAMF ¶ 44; DRPSAMF ¶ 44.

Although Cartage maintained an official "Open Door Policy," which encouraged employees to bring any concerns to any member of management, in Mr. Manske's case, managers expressed anger and yelled at him when he brought complaints forward, told him that his complaints were not made in good faith, took issue with his reported concerns about the vehicles, and extended his probationary period due to his reports about his equipment.[32] DSMF ¶ 26; PRDSMF ¶ 26. Cartage also gave employees access to the UPS Help Line, a toll-free telephone number that is set up for employees to report, anonymously if they choose, safety concerns or violations of the law or company policies. DSMF ¶ 27; PRDSMF ¶ 27. At all relevant times, Cartage provided new employees with information about the

---

[30] Cartage interposed a qualified response, noting that Mr. Stuart defined "technical violation" in a particular fashion. DRPSAMF ¶ 43. The Court expanded the recitation to include Mr. Stuart's definition.

[31] Cartage interposed a qualified response, saying that Mr. Stuart used the term "technical violations" to describe conditions not specifically covered by the DOT regulations. DRPSAMF ¶ 44. Mr. Manske cites a portion of Mr. Stuart's deposition, which reads:

> Q.  Is a technical violation of the Department of Transportation's Motor Vehicle Safety Regulations still a violation?
> A.  Yes.

PSAMF Attach. 11, *Dep. of Darry W. Stuart,* at 112:6-9. In view of Mr. Stuart's unequivocal response, the Court refuses to accept Cartage's qualified response and deems Mr. Manske's paragraph 44 admitted.

[32] Mr. Manske interposed a qualified response. PRDSMF ¶ 26. The Court has included in its recitation the substance of his qualified response.

Open Door Policy and the UPS Help Line and also publicly displayed information about those resources in the break room at the Portland facility.  DSMF ¶ 28; PRDSMF ¶ 28.

Mr. Manske never reported to his supervisors at Cartage that he believed that the repairs he was writing up in his DVIRs were not being made.[33]  DSMF ¶ 37; PRDSMF ¶ 37.  Mr. Manske never made a complaint to Cartage's Human Resources Department, to the UPS Help Line, to the United States Department of Transportation, to the Occupational Health & Safety Administration, or to any outside law enforcement, consumer protection, or governmental agency concerning his employment at Cartage or the vehicles he drove during his employment at Cartage or the vehicles he drove during his employment at Cartage.  DSMF ¶¶ 41-45; PRDSMF ¶¶ 41-45.

### 5.   Dennis Manske and the Extension of His Probation

On July 30, 2008, Cartage notified the Union business agent that it was electing to extend Mr. Manske's probation for thirty days.  DSMF ¶ 46; PRDSMF ¶ 46.  According to Mr. Chipman, there had been no basis for disciplinary action against Mr. Manske up to the point of deciding to extend his probation.[34]  PSAMF

---

[33] Cartage asserts in paragraphs 38 through 40 that every time Mr. Manske reported a safety issue with a vehicle, Cartage ensured that the necessary repairs were made immediately, that he never refused to drive a Cartage vehicle, and that he never took a vehicle out of service on the ground that it was unsafe or on any other grounds.  DSMF ¶¶ 38-40.  Mr. Manske denied each statement. PRDSMF ¶¶ 38-40.  As the Court is obligated to view the facts in the light most favorable to Mr. Manske, it has not included these paragraphs.

[34] Cartage interposed a qualified response, contending that there was no basis for discipline with respect to Mr. Manske's performance as a driver, but that people other than Mr. Chipman thought there were other grounds for disciplinary action.  DRPSAMF ¶ 45.  The Court amended Mr. Manske's paragraph 45 to reflect that his sole citation was to Mr. Chipman's deposition.

¶ 45; DRPSAMF ¶ 45.  Ms. Easler told Sylvia Hebert, the Teamster Representative,

that Mr. Manske was a "complainer."  PSAMF ¶ 46; DRPSAMF ¶ 46.

In its January 8, 2009 submission to the Maine Human Rights Commission,

Cartage stated:

> As is often the case with start-up services, [Cartage] encountered a
> number of unanticipated issues that needed to be resolved when it
> began performing the linehaul service.  Airport security requirements,
> for example, require that drivers either be "badged" with airport
> specific identification or that they use vehicles owned and marked by
> specific organizations.  On Mr. Manske's first trip to [the Manchester-
> Boston Regional Airport (MHT)] on July 7, 2008, [Cartage] learned
> that unbadged drivers are not permitted to receive deliveries at MHT
> in rented trucks, even though the unbadged driver in a company-
> owned truck or a badged driver in a rented truck would be permitted to
> do so.  Mr. Manske was therefore unable to perform his evening
> linehaul route from July 8 until July 14, 2008, when [Cartage]
> swapped a rented tractor it had been using for a company-owned
> tractor.
>
> As a result of this delay, Mr. Manske had been performing the linehaul
> service for only about two weeks when his initial thirty day
> probationary period was scheduled to end.  Management wanted more
> time to evaluate Mr. Manske's performance when many of the
> preliminary linehaul service issues had been resolved.  The company,
> therefore, determined in late July that it would extend Mr. Manske's
> probationary period for an additional 30 days.

PSAMF ¶ 47; DRPSAMF ¶ 47.  In fact, the issue with access to the airport was

promptly resolved and Mr. Manske was only unable to do the long haul route for

three days.[35]  PSAMF ¶ 48; DRPSAMF ¶ 48.  Mr. Chipman did not hear that

---

[35] Cartage denied this paragraph.  DRPSAMF ¶ 48.  However, Mr. Chipman agreed at his deposition
that the time period was three days.  PSAMF ¶ 48; PSAMF Attach. 1, *Videotaped Dep. of Darren
Chipman*, at 105:2-8 (*Chipman Dep.*).   Furthermore, Cartage admitted in its response to Mr.
Manske's requests for admission that Mr. Manske did not drive the Portland to Manchester route
from on July 8 through July 11, was not scheduled on July 12 and July 13, which were weekend
days, and resumed the linehaul on July 14, 2008.  PSAMF Attach. 13, *Def. UPS Cartage Servs., Inc.'s
Resp. to Pl.'s First Req. for Admissions*, ¶¶ 21-24.  Whether there is a discrepancy between what
Cartage told the Maine Human Rights Commission and its current position is a matter of

Cartage was extending Mr. Manske's probation because there had been insufficient time to observe whether he could do the longhaul correctly.[36]   PSAMF ¶ 49; DRPSAMF ¶ 49.  After resolving the issue of his gaining access to the Manchester airport, Mr. Chipman believes that Mr. Manske drove the run fine right up until the time of the decision to extend his probation.[37]  PSAMF ¶ 50; DRPSAMF ¶ 50.

According to Mr. Chipman, the decision to extend Mr. Manske's probation was based on the fact that "we had all these write-ups on these vehicles, that he possibly was getting, you know, a bad taste for UPS in the sense that, you know, things weren't—the company wasn't to what he expected, I guess, is how to say it so we were trying to get all the issues resolved and then start fresh over."  PSAMF ¶ 59; DRPSAMF ¶ 59.  The "issues" that Mr. Chipman referred to are the problems with the trucks that Mr. Manske noted on his DVIRs.  PSAMF ¶ 60; DRPSAMF ¶ 60.  Regarding the extension of Mr. Manske's probation, Mr. Chipman says, "I advocated for him to extend his period but it was the basis of basically on the attitude.  We wanted to make sure that clear slate going forward and things would

interpretation; however, the Court views the record in the light most favorable to Mr. Manske and has included paragraph 48.

[36] Cartage denied this paragraph, referring to Ms. Easler's and Mr. Chipman's depositions. DRPSAMF ¶ 49.  However, Mr. Manske cited a portion of Mr. Chipman's deposition that reads:
> Q.  From your perspective at the end of the first probationary period, had you not had sufficient opportunity to observe his ability to do that long-haul properly?
> A.  I would say no, we had sufficient time to observe that.
> Q.  Do you remember ever saying something to the effect of we need to extend the probation because we have not had sufficient time to observe whether he can do the long-haul correctly?
> A.  I did not hear any of that, nope.

*Chipman Dep.* 105:19-106:3.  Mr. Chipman's deposition testimony is sufficient record support for paragraph 49.  The Court declines to accept Cartage's denial and deems the paragraph admitted.

[37] Cartage moved to strike this paragraph on the ground that it asserts Mr. Chipman's state of mind, not a fact.  DRPSAMF ¶ 50.  The Court DENIES Cartage's motion to strike.

change" and Mr. Chipman's view was that Mr. Manske's attitude involved the equipment and the job not meeting his expectations.  PSAMF ¶ 61; DRPSAMF ¶ 61.  Mr. Chipman was also concerned that Mr. Manske's expressing dissatisfaction could spread to other employees.[38]  PSAMF ¶ 62; DRPSAMF ¶ 62.

According to Ms. Easler, Mr. Manske's probation was extended on July 30, 2008 because it was Ms. Easler's "fear" that his "attitude was one of confrontation and challenge, and that perhaps his desire for better equipment was outside of Cartage's scope (safety aside)."[39]  PSAMF ¶ 51; DRPSAMF ¶ 51.  When Ms. Easler went to her supervisor, Randy Maier, and recommended that Mr. Manske's probation be extended, the sole reason she provided to him was Mr. Manske's "overall attitude" and it was on this basis that Mr. Maier agreed to the extension of the probation.[40]  PSAMF ¶ 52; DRPSAMF ¶ 52.  According to Ms. Easler, negative information provided by Mr. Lovejoy, Mr. Chipman, and Mr. Smith about Mr. Manske in the context of extending his probation included that they felt he was very challenging and very condescending, that the company equipment was never going

---

[38] Cartage denied this paragraph on the ground that Mr. Chipman was concerned that Mr. Manske's attitude and complaints that Cartage should use different equipment would spread to other employees.  DRPSAMF ¶ 62.  The Court refuses to accept Cartage's denial because Mr. Manske's paragraph is supported by the record citation.

[39] Cartage interposed a qualified response, noting that Ms. Easler's statement was one of many factors.  DRPSAMF ¶ 51.  The Court declines to accept the qualified response because Mr. Manske's paragraph is supported by his record citation.

[40] Cartage interposed a qualified response, noting that Mr. Maier testified that he could not remember the exact words Ms. Easler had used, but that his memory is that the reason related to Mr. Manske's overall attitude and he deferred to her judgment.  DRPSAMF ¶ 52.  As the qualified response does not contradict the contents of paragraph 52, the Court has included the paragraph as submitted.

to meet his satisfaction, and that he was going to be a very difficult employee to manage.  PSAMF ¶ 53; DRPSAMF ¶ 53.

### 6.    Extended Probation

Following the extension of his probation, Mr. Manske began to secretly bring a small digital audio recorder to work and to tape record conversations with his superiors without their knowledge, specifically on August 4, 2008 and August 16, 2008.   DSMF ¶¶ 47-48; PRDSMF ¶¶ 47-48.   During one of the recorded conversations between Mr. Manske and Ms. Easler on August 4, 2008, Mr. Manske told her that Kris-Way was in the process of "getting the issues taken care of with the replacement truck."[41]   DSMF ¶ 49; PRDSMF ¶ 49.  During the August 4, 2008

---

[41] In its paragraph 49, Cartage asserted that Mr. Manske said that the issues he had raised with the trucks "had been taken care of."  DSMF ¶ 49.  Mr. Manske interposed a qualified response, stating that he had told Ms. Easler only that Kris-Way was in the process of "getting the issues taken care of with the replacement truck."  PRDSMF ¶ 49.  The Court reviewed the portion of the transcript cited by Cartage.  During the cited portion of the transcript, Mr. Manske first discussed an old truck that he thought (and Ms. Easler agreed) should be sent to the junkyard.   Then he discussed the replacement truck and told her that they were getting the issues with the replacement truck taken care of.  Finally, he says "those issues have been taken care of."  It is unclear from the transcript whether by this phrase Mr. Manske was referring only to the issues with the replacement truck or was including the former issues with the junked truck.  In any event, Cartage's statement, which implies he was referring to all the issues with all the trucks, is not supported by the record.  Because the Court is required to view the evidence in the light most favorable to Mr. Manske, it used his version of this conversation.

In its paragraph 50, Cartage asserted that in each of the secretly recorded conversations, Ms. Easler reminded and instructed Mr. Manske that it was his job to write up any maintenance or safety-related issues with the trucks he was asked to drive and instructed him to continue to write up any concerns he had from his inspections.  DSMF ¶ 50.  Mr. Manske denied Cartage's paragraph 50, saying that its citations do not support the statements and that Ms. Easler told him that she had extended his probation because of his reports about the equipment.  PRDSMF ¶ 50.  In support of the paragraph, Cartage cited Ms. Easler's affidavit and the transcripts in Exhibits D and E of James Radke's affidavit.  DSMF ¶ 50.  Paragraph thirty-three of Ms. Easler's affidavit states only that during a conversation on August 4, 2008, she "encouraged Mr. Manske to continue to document any maintenance issues that he observed."  *Aff. of Marie L. Easler* ¶ 33 (Docket # 49) (*Easler Aff.*).  The cited portion of the August 4, 2008 conversation does not support Cartage's statement.  *Aff. of James F. Radke* (Docket # 48) Attach. 4, *Transcription of Conversation on Aug. 4, 2008*.  The Court has not included this part of paragraph 50 in its statement of facts.  The cited portion of the August 16, 2008 recording does support the statement but only as regards the conversation in which Ms. Easler told Mr. Manske that "[his] job is to keep writing out the PMs."  *Id.* Attach. 5, *Transcription of*

recorded conversation, Ms. Easler told Mr. Manske that it was his job to keep writing preventive maintenance slips regarding any safety-related issue; however, during the August 4, 2008 recorded conversation, she had told him that she had extended his probation because of his reports about his equipment.  DSMF ¶ 50; PRDSMF ¶ 50.  Specifically, she told him that she had extended his probation because his expectations for the equipment were "very, very high" and she did not know if Cartage could "fulfill everything you're looking for and still maintain a happy driver at the end of—of 30 days."  PRDSMF ¶ 50; PSAMF Attach. 10, *Transcription of Conversation on Aug. 4, 2008*, at 16:1-5 (*Aug. 4 Recording*).  Mr. Manske did not note any maintenance issues on his DVIRs for the trucks he drove during the month of August 2008.  DSMF ¶ 51; PRDSMF ¶ 51.

Article 30 of the CBA required that drivers take a thirty-minute break between the third and sixth hours of work.  DSMF ¶ 52; PRDSMF ¶ 52.  On or about August 13, 2008, Ms. Easler told Mr. Manske that he needed to take a thirty-minute break by 8:30 p.m., which was required by the CBA.  DSMF ¶ 53; PRDSMF ¶ 53.  Mr. Manske explained to Ms. Easler that he was not able to take a break at 8:30 p.m. because of his schedule and because he was not aware of a place to park his truck.[42]  DSMF ¶ 54; PRDSMF ¶ 54.  Mr. Manske said that if it was just a matter of satisfying the Union's break clause, he would be happy to just write in a

---

*Conversation on Aug. 4, 2008,* at 27:5-12.  The Court has included the portion of Cartage's paragraph 50 that is supported by the record but has eliminated the portion that is not.  Further, as the Court is obligated to view the record in the light most favorable to Mr. Manske, it has included his clarification of Cartage's paragraph 50.  PRDSMF ¶ 50.

[42] Because the Court is required to view the record in the light most favorable to Mr. Manske, it has recited his qualified response, not Cartage's statement.

break and keep on working.[43]  DSMF ¶ 55; PRDSMF ¶ 55.  Ms. Easler replied that

it was quite unacceptable to falsify any kind of record.[44]  DSMF ¶ 56; PRDSMF

¶ 56.  Ms. Easler testified, however, that Mr. Manske's suggestion had not violated

Cartage policy.[45]  PRDSMF ¶ 56.  Mr. Manske replied that he would not record that

he had taken a break until after he had returned to Portland.  DSMF ¶ 57;

PRDSMF ¶ 57.  Ms. Easler responded by repeating that falsifying a time record was

not acceptable and must not be done and explained that both safety and integrity

are extremely important to the company.  DSMF ¶ 58; PRDSMF ¶ 58.

On or about August 16, 2008, Ms. Easler told Mr. Manske that at the end of

the probationary period Cartage wanted someone who is "able to fit in, be able to

take direction a lot of times without a whole lot of input.  Case in point is the

---

[43] Because the Court is required to view the record in the light most favorable to Mr. Manske, it has recited his qualified response, not Cartage's statement.

[44] Cartage's paragraph 56 stated that Ms. Easler told Mr. Manske that it was unacceptable for him to falsify his time cards and that it also exposed the company to significant liability if he had an accident when he had recorded that he was on a break and not working.  DSMF ¶ 56.  Mr. Manske denied this statement, saying that his deposition transcript did not support the assertions. PRDSMF ¶ 56.  He claims that writing in a break did not violate either the Union's break clause or Cartage policy and accordingly, Ms. Easler did not document the incident.  *Id.*

The Court reviewed the cited portion of Mr. Manske's transcript and has included what is reflected in his testimony.  PSAMF Attach. 2, *Continued Dep. of Dennis Manske*, at 200:7-20.

[45] In his response to Cartage's paragraph 56, Mr. Manske asserted that his suggestion that he write in a break and keep working was not a violation of either the CBA or Cartage policy.  PRDSMF ¶ 56. For support he cites Ms. Easler's deposition at page 98.  The Court reviewed this portion of Ms. Easler's deposition transcript and found no mention of the CBA and therefore the Court has not included that portion of Mr. Manske's assertion in its recitation of the facts.  Ms. Easler testified that she viewed Mr. Manske's "saying that he would be willing to write down on his time slip that he took a break but continue to work through . . . as a violation of the company's dishonesty policy."  *Easler Dep.* at 95:22-96:1. But she later says that he had not "at that point" violated the policy but rather that "there was an inference to it."  *Easler Dep.* at 98:5-17.  The Court understands Ms. Easler's testimony to say that because Mr. Manske had only suggested that he write in the break and continue working, he had not actually violated Cartage policy and therefore he was not written up. Manske's assertion that to actually write in a break and continue working though the break would not violate either Cartage policy or the CBA is not supported by this portion of Ms. Easler's deposition transcript.

equipment.  I can listen to you all day, Dennis, about equipment and how it should be specked, and how there should be a power mirror, power window on the passenger side.  I cannot affect the change in that.  So it's a waste of my time to even listen to you."  PSAMF ¶ 54; DRPSAMF ¶ 54.  Most of the examples Ms. Easler could think of regarding Mr. Manske being challenging and condescending all related to his reports regarding the Cartage equipment he was asked to use.[46] PSAMF ¶ 55; DRPSAMF ¶ 55.  The Cartage managers also raised at the end of his probationary period their feeling that the Cartage equipment would not ever meet Mr. Manske's satisfaction.  PSAMF ¶ 56; DRPSAMF ¶ 56.  Ms. Easler perceived that Mr. Manske did not appear to be a very happy employee.[47]  PSAMF ¶ 57; DRPSAMF ¶ 57.  If Mr. Manske's probation had not been extended and he had become a member of the Union after the first thirty days, he would not have been terminated for anything that he did during the period of employment after his probation was extended and would have remained employed.[48]  PSAMF ¶ 58; DRPSAMF ¶ 58.

---

[46] Cartage denied paragraph 55 on the ground that during the cited testimony, Ms. Easler referred to a list of items she had previously raised in her testimony.  DRPSAMF ¶ 55.  The Court reviewed the cited testimony and has amended the statement to reflect that most of the examples Ms. Easler recalled related to the Cartage equipment.

[47] Mr. Manske's paragraph 57 characterized Ms. Easler's actual testimony differently.  PSAMF ¶ 57.  The Court replaced his paragraph with her actual testimony on her perception of his happiness.  In addition, Mr. Manske's paragraph 57 made the same assertion the Court addressed and resolved in paragraph 55.

[48] Cartage moved to strike this paragraph as a hypothetical, not a fact.  DRPSAMF ¶ 58.  Although the Court agrees that the paragraph is inartfully worded, Ms. Easler did testify that if Mr. Manske's probation had not been extended and he had become a member of the Union, Cartage would have had difficulty removing him under the CBA.  Her testimony confirms that Cartage had an incentive to extend his probation if it was considering terminating him.  The Court DENIES Cartage's motion to strike.

### 7.     Cartage Terminates Dennis Manske

On August 25, 2008, before the end of his extended probationary period, Cartage decided that it would not retain Mr. Manske as a permanent employee and terminated his employment.  DSMF ¶ 59; PRDSMF ¶ 59.  As of August 16, 2008, Cartage had no performance issues with Mr. Manske.[49]  PSAMF ¶ 63; DRPSAMF ¶ 63.  Regarding Mr. Manske's possible termination, Mr. Lovejoy thought that he "just didn't seem like he was fit for the position;" not that he could not drive properly, but that "he did not seem like he was happy there."[50]  PSAMF ¶ 64; DRPSAMF ¶ 64.  According to Mr. Lovejoy, the impression that Mr. Manske was unhappy came from the issues he raised with the conditions of employment.  PSAMF ¶ 65; DRPSAMF ¶ 65.

Mr. Manske's "prior history of all these complaints and the constant desire to have equipment other than what our company provided" were factors in Ms. Easler's decision to terminate his employment.[51]  PSAMF ¶ 66; DRPSAMF ¶ 66.

---

[49] Cartage denied this paragraph.  DRPSAMF ¶ 63.  For support, Mr. Manske cited his August 16, 2008 secret recording of Ms. Easton at page 26:

> We've got no performance issues with you, OK?  I'll make that very clear.  It's not performance issues.

PSAMF Attach. 7, *Transcription of Conversation on Aug. 16, 2008*, at 26:2-3.  In view of this unequivocal statement from Ms. Easler, it is difficult to understand how Cartage could deny this statement in good faith.  The Court has included it in its recitation.

[50] Cartage denied this statement on the ground that the testimony does not indicate that Mr. Lovejoy made the comments to Ms. Easler.  DRPSAMF ¶ 64.  Again, it is difficult to understand how Cartage could properly deny the entire paragraph since the quotations come directly from Mr. Lovejoy's deposition.  PSAMF Attach. 3, *Videotaped Dep. of James Lovejoy*, at 30:2-6.  The Court agrees that Mr. Lovejoy's deposition is ambiguous as to whether he was expressing these views to Ms. Easler— though he may have been—but it is clear that Mr. Lovejoy had these views about Mr. Manske.  The Court has altered the paragraph to reflect Mr. Lovejoy's stated views about Mr. Manske.

[51] Cartage interposed a qualified response to this paragraph on the ground that there were other factors as well.  DRPSAMF ¶ 65.  Mr. Manske's paragraph assumes, however, that there may have been other factors.  PSAMF ¶ 65.  The Court has included paragraph 65 in its recitation.

Ms. Easler recommended to Mr. Maier that Cartage terminate Mr. Manske's employment.  PSAMF ¶ 67; DRPSAMF ¶ 67.  Mr. Maier approved Mr. Manske's termination and Ms. Easler's comments in an earlier conversation with Mr. Maier about Mr. Manske's "overall attitude" were a factor in Mr. Maier's decision to approve the termination of Mr. Manske.[52]  PSAMF ¶ 68; DRPSAMF ¶ 68.

### C.    The Positions of the Parties

#### 1.    Cartage's Motion

Cartage contends that it is entitled to summary judgment on each of Mr. Manske's claims because he "cannot demonstrate that he engaged in protected activity" under the STAA, the MWPA, or the MHRA.  *Def.'s Mot.* at 10.  As Mr. Manske "did nothing more than what was required of him by Cartage and by federal law," namely "notify the company of [d]eficiencies that he observed with the vehicles that he was asked to drive so that Cartage could make the necessary repairs," Cartage says the whistleblower statutes do not apply because they "do not protect reports made as a required part of an employee's job duties."  *Id.*  It explains that "no public policy is implicated when an employee reports what the law and his job duties already require of him."  *Id.*

Cartage says that the same legal standard applies to all three causes of action and each statute provides that "[a]n employee who makes a required report is only doing what his employer expects of him and pays him to do and is therefore not

---

[52] Cartage denied this paragraph.  DRPSAMF ¶ 68.  Again, the Court has reviewed the cited deposition testimony and finds that Mr. Maier said precisely what Mr. Manske set forth in paragraph 68.  The Court cannot understand how Cartage could in good faith deny what Mr. Manske clearly said in his deposition.

in the class of employees that whistleblower statutes were enacted to protect." *Id.*
at 13.  For this point, Cartage relies heavily on two decisions from the Federal
Circuit, *Willis v. Department of Agriculture*, 141 F.3d 1139 (Fed. Cir. 1998) and
*Huffman v. Office of Personnel Management*, 263 F.3d 1341 (Fed. Cir. 2001).  In
*Willis*, the Federal Circuit rejected a whistleblower claim from a federal employee
who "did no more than carry out his required everyday job responsibilities."  141
F.3d at 1144.  Similarly in *Huffman*, the Federal Circuit held that "reports made as
part of an employee's assigned normal job responsibilities are not covered by the
WPA when made through normal channels."  263 F.3d at 1344.

Cartage claims that if the whistleblowing statutes are interpreted to
encompass the types of complaints that Mr. Manske made to Cartage, "thousands of
drivers in the trucking industry alone, who are subject to state and federal trucking
industry regulations, would automatically establish a prima facie case of whistle-
blower activity whenever a disciplinary action is taken against them simply by
doing their jobs." *Def.'s Mot.* at 15.  Cartage adds that its position "does not mean
that whistleblower statutes can never protect employees like Manske who are
required to report maintenance issues." *Id.*  Rather, it says, "it simply means that
the reporting of [d]eficiencies through ordinary channels, which is required by law
and by Cartage, is not protected." *Id.*

### 2.    Dennis Manske's Response

Mr. Manske responds by employing the *McDonnell Douglas* burden-shifting
analysis to the facts in his STAA and MWPA claims. *Pl.'s Opp'n* at 6-8.  To make

27

out a *prima facie* case for these claims, he says, he must establish that he engaged in protected activity, that he was subjected to an adverse employment action, and that there is a causal connection between the two. *Id.* at 6-7. Then the burden shifts to the employer to produce evidence of a legitimate, non-retaliatory reason for the adverse employment action and finally back to the employee to demonstrate that the proferred reason is a pretext. *Id.* at 7.

Mr. Manske then turns to the main point of Cartage's motion: its claim that Mr. Manske's complaints were not protected conduct because he was only doing his job. *Id.* at 8-16. Contrary to Cartage's contentions, Mr. Manske maintains that internal reports to an employer do fall within conduct protected by the STAA and the MWPA. *Id.* at 8-9, 11-15. Furthermore, he says that protecting employees who report illegal and unsafe conditions is consistent with the purpose of the federal and state statutes. *Id.* at 9-11, 15-16. Finally, he distinguishes *Willis* and *Huffman* as applying a "different law to a different set of facts." *Id.* at 16-20.

### 3. Cartage's Reply

In its reply, Cartage contends that Mr. Manske's position is "based on a fundamental fallacy that is unsupported by the undisputed facts of this case: that Manske was in any way involved in disclosing *wrongdoing* on the part of Cartage. *Def.'s Reply* at 1 (emphasis in original). Cartage emphasizes that, as it is in the trucking business, automotive repairs are in the ordinary course of its business, that Mr. Manske's complaints about the trucks were entirely routine, and that Cartage promptly responded to his complaints by repairing the vehicles. *Id.* at 3.

In these circumstances, Cartage says, the law does not protect his conduct. *Id.* at 3-8.  Cartage also disputes Mr. Manske's concerns about the policy implications of a dismissal of his claims. *Id.* at 8-9.

## II.    DISCUSSION

### A.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).  An issue is genuine if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas*, 637 F.3d at 56 (quoting *McCarthy*, 56 F.3d at 315).

Once this evidence is supplied by the moving party, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted).  In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex,*

*Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009); *Carroll*, 294 F.3d at 236-37.

### B.   Protected Conduct under the STAA

The nub of the parties' dispute is whether Mr. Manske's complaints to Cartage amount to protected conduct under the law.  The Court turns to the STAA; which reads in part:

(a)  Prohibitions.

(1) A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because—

(A) (i) the employee . . . has filed a complaint . . . related to a violation of a commercial motor vehicle safety or security regulation, standard, or order . . . ; or
(ii) the person perceives that the employee has filed or is about to file a complaint or has begun or is about to begin a proceeding related to a violation of a commercial motor vehicle safety or security regulation, standard, or order;

(B) the employee refuses to operate a vehicle because—
(i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security; or
(ii) the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition;

. . . . . . . . .

> (2) Under paragraph (1)(B)(ii) of this subsection, an employee's apprehension of serious injury is reasonable only if a reasonable individual in the circumstances then confronting the employee would conclude that the hazardous safety or security condition establishes a real danger of accident, injury, or serious impairment to health. To qualify for protection, the employee must have sought from the employer, and been unable to obtain, correction of the hazardous safety or security condition.

49 U.S.C. § 31105(a). In *Brock v. Roadway Express, Inc.*, 481 U.S. 252 (1987), the United States Supreme Court observed that Congress enacted the STAA "in 1983 to encourage employee reporting of noncompliance with safety regulations governing commercial motor vehicles." *Id.* at 258. The *Brock* Court noted that "Congress recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation for reporting these violations." *Id.* The STAA, the Supreme Court explained, "reflects a careful balancing of the relative interests of the Government, employee, and employer." *Id.* at 259. The balance is between the "Government's interests in promoting highway safety and protecting employees from retaliatory discharge" and the employer's "interest in controlling the makeup of its work force." *Id.* at 262-63.

The DOT has promulgated regulations to guide the enforcement of the STAA. Under 49 C.F.R. § 396.3(a), "[e]very motor carrier . . . must systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles . . . subject to its control." 49 C.F.R. § 396.3(a). The DOT imposes an obligation on the drivers "to report" and "every driver shall

prepare a report in writing at the completion of each day's work on each vehicle operated." 49 C.F.R. § 396.11(a)(1). Among the equipment the DVIR must "at least" cover are windshield wipers, wheels and rims, and rear vision mirrors. 49 C.F.R. § 396.11(a)(1). The regulations mandate that the report "identify the vehicle and list any defect or deficiency discovered by or reported to the driver which would affect the safety of operation of the vehicle or result in its mechanical breakdown." 49 C.F.R. § 396.11(b). The regulations also require "corrective action": "Prior to requiring or permitting a driver to operate a vehicle, every motor carrier . . . shall repair any defect or deficiency listed on the driver vehicle inspection report which would be likely to affect the safety of operation of the vehicle" and "[e]very motor carrier . . . shall certify on the original driver vehicle inspection report . . . that the defect or deficiency has been repaired or that repair is unnecessary before the vehicle is operated again." 49 C.F.R. § 396.11(c).

Viewing the evidence in the light most favorable to Mr. Manske, there is enough evidence in this record for the Court to find that Mr. Manske's reports to Cartage concerning the condition of its vehicles fit within either the listed conditions for which a report is mandatory, 49 C.F.R. § 396.11(a)(1), or the regulation's broader requirement that the driver report "any defect or deficiency" that "would affect the safety of operation of the vehicle or result in its mechanical breakdown." 49 C.F.R. § 396.11(b).

The question narrows to the issue posed by the parties: whether Mr. Manske's DOT-mandated reports to Cartage about the condition of its vehicles

constitute protected conduct under STAA.  First, the Court is not convinced that the Federal Circuit decisions in *Willis* and *Huffman* apply to a cause of action under the STAA.  In *Willis* and *Huffman*, the Federal Circuit addressed claims under the Whistleblower Protection Act, 5 U.S.C. § 1211 *et seq.*, which is textually different from the STAA.[53]  The WPA, focusing on complaints of gross mismanagement, gross waste of funds, abuse of authority, or danger to public health or safety, provided that a government official may not:

> take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee because of any disclosure of information by an employee . . . which the employee . . . reasonably believes evidences a violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

*Willis*, 141 F.3d at 1142 (quoting 5 U.S.C. § 2302(b)(8)).  With this definition in mind, the *Willis* Court concluded that Mr. Willis's complaints to his supervisors after a number of his field findings were reversed on appeal did not amount to conduct protected under the WPA.  *Id.* at 1143-44.  The *Willis* Court held that an employee who makes disclosures as part of his normal duties cannot claim the protection of the WPA.  *Id.* at 1144.

In 2001, the Federal Circuit in *Huffman* concluded that an employee's complaint to a supervisor about that supervisor's conduct did not constitute a "disclosure" under the WPA.  263 F.3d at 1350 ("When an employee reports or states that there has been misconduct by a wrongdoer to the wrongdoer, the

---

[53] Since *Willis* and *Huffman* the United States Code citation for the WPA has been re-codified and the provisions are now under 5 U.S.C. § 1211 *et seq.*

employee is not making a 'disclosure' of misconduct"). But the *Huffman* Court refined *Willis* to include within the protection of the WPA disclosures made by an employee "outside of normal channels" and disclosures by an employee that are not part of the employee's "normal duties." *Id.* at 1354. Thus, in *Willis* and *Huffman*, the Federal Circuit clarified that when employee disclosures rise above an employee's ordinary and routine job duties, they merit the protection of the WPA.

The STAA is a very different statute. Presumably because of the direct impact of commercial vehicles on public safety, in enacting the STAA, Congress eliminated much of the ambiguity in the WPA. Congress recognized that by performing ordinary and routine job duties, drivers "are often best able to detect safety violations," *Brock*, 481 U.S. at 258, and Congress therefore mandated reporting requirements. Furthermore, as the DOT regulations make clear, in making the required report, it is the employee's determination of whether a "defect or deficiency . . . would affect the safety of operation of the vehicle or result in its mechanical breakdown." 49 C.F.R. § 396.11(b). Unlike the "disclosure" requirement of the WPA, the STAA protects employees who have "filed a complaint" or are "about to file a complaint." 49 U.S.C. § 31105(a)(1)-(2).

In *Clean Harbors Environmental Services v. Herman*, 146 F.3d 12 (1st Cir. 1998), the First Circuit rejected an argument similar to the one Cartage is making here. In *Clean Harbor*, the employer contended that "the STAA anti-retaliation protection is available only to employees who file complaints with a government agency or a court." *Id.* at 19. The First Circuit disagreed and concluded that "[a]

34

construction of the STAA that covers only complaints filed with courts or government agencies would narrow the mechanisms to achieve [Congress's] policy goals, leaving unprotected employees who in good faith assert safety concerns to their employers, or who indicate an unwillingness to engage in such violations."[54] *Id.* at 21.

Other circuits have reached the same conclusion. In *Dalton v. United States Department of Labor*, 58 Fed. Appx. 442 (10th Cir. 2003), the Tenth Circuit concluded that a driver who had been fired after refusing to operate a truck due to his concerns about the safety of the truck's cables had made a complaint to his supervisor that was protected under the STAA. In *Moon v. Transport Drivers, Inc.*, 836 F.2d 226 (6th Cir. 1987), the Sixth Circuit noted that driver reports to a superior about defective conditions in a company truck were protected activity under the STAA. Similarly, in *Yellow Freight Systems, Inc. v. Reich*, 38 F.3d 76 (2d Cir. 1994), a driver's complaint about the truck's lack of adequate power "constituted activity protected by the 'because' clause of the STAA" and the Court held that the employer "discharged him as a result of his engagement in this protected activity." *Id.* at 85. Significantly, in *Dalton*, *Moon,* and *Yellow Freight*, the drivers reported the defective conditions to their supervisor or manager and in *Yellow Freight*, the driver completed a DVIR. *Dalton*, 58 Fed. Appx. at 443-44; *Moon*, 836 F.2d at 228; *Yellow Freight*, 38 F.3d at 78-79.

---

[54] Cartage's reliance on *Capalbo v. Kris-Way Truck Leasing, Inc.*, 821 F. Supp. 2d 397 (D. Me. 2011) is misplaced. In *Capalbo*, the Court concluded that the employee's "wage complaints are not within the sphere of protected activities for purposes of the STAA." *Id.* at 418. There is no evidence that Mr. Manske's complaints were wage complaints.

35

The Court rejects Cartage's attempt to infuse WPA standards into an STAA cause of action.

### C.     MWPA and MHRA Counts

Confident of victory on the STAA count, Cartage blankly asserts that "[t]he anti-retaliation provisions of the MWPA and the MHRA are modeled after the STAA and protect similar reporting activities. *Def.'s Mot.* at 11.  Cartage assumed that once the Court ruled in its favor on the STAA, the state statutory counts would fall of their own weight, and it made no separate argument about whether it was entitled to judgment on the state statutory counts.  The state statutes have not been quoted or analyzed; no Maine case law has been cited.  Because any claim that Cartage may have against the application of the MWPA and the MHRA has not been properly developed, the Court has not reached those issues.

## III.    CONCLUSION

The Court DENIES the Defendant's Motion for Summary Judgment as to Count I and DISMISSES without prejudice the Defendant's Motion for Summary Judgment as to Counts II and III.  (Docket # 46).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 4th day of May, 2012

36